Good morning, Your Honors. May it please the Court, Christy Hughes from Federal Defenders on behalf of Mr. Martinez. The I.J. violated Mr. Martinez's due process rights by failing to meaningfully advise him that he was eligible for voluntary departure. The I.J.'s advisal didn't explain the benefits or the consequences of voluntary departure, and instead made it sound like voluntary departure was just a delay in being deported. And this flawed advisal prejudiced Mr. Martinez because even though he didn't have substantial positive equities, his negative equities were minimal when considered in context. And given that voluntary departure is a minimal form of relief, it's plausible that an I.J. in balancing his equities would have granted Mr. Martinez voluntary departure. You didn't have any equities in his favor, did you? Well, he had some, Your Honor. He had lived here about a year and a half. He had a work history. He had worked at a restaurant and in construction, and he had no prior convictions. And I think there's a couple things that we should keep in mind when looking at his equities. One of those is that he was 20 years old at the time of this hearing before the I.J. That's not a lot of time to accrue a lot of the positive equities that we sometimes see, such as a long work history here or a citizen wife and children. He'd only been here a few years, and he was only 20 years old. And so the work history that he had accrued is a substantial positive equity given his factors. Was there any evidence of that work history other than what he said in his declaration? We don't, Your Honor. But that declaration was signed under penalty of perjury, and I think the district court accepted it because she took that into account when balancing the equities. Something also to keep in mind when considering the equities is that Mr. Martinez didn't have a lot of negative equities. And so when we do the balance, it really is a discretionary grant, and so it is a balance. And so when someone doesn't have a lot of negative equities, they need fewer positive equities to balance them out. Here, his negative equities were that he had 10 prior catch-and-releases, which the district court thought was significant. But again, looking at it in context, the Immigration Service never thought those were significant enough to place him in removal proceedings before. All they did was remove him back to Mexico from the United States. It's also – Was there – what was the evidence that supported or could support a conclusion that he had been leading the other immigrants across the border? It was just his statement, which we've challenged. I think the government submitted the audio tape to this court. It's hard to make out. The district court did make a finding that he admitted that he had smuggled immigrants on a raft. We've challenged that as clearly erroneous. This court can listen to the tape. The district court herself said she had no special expertise in listening to disputed audio tapes. But I think something important to consider is that the immigration judge didn't mark that allegation as admitted, and he didn't mark the alien smuggling ground of removability as sustained. And so something – just something to consider when looking at those equities is that the immigration judge, I think, didn't view them as substantial. What's the most factually analogous case that you can support in your favor on these equities? Well, I think there's two cases. We don't have one that's directly on all fours with this. And part of that, as noted in the reply brief, is the BIA just doesn't really report when grants of voluntary departure are given and then upheld on appeal. There were 27,000 grants of voluntary departure in 2004, and an appeal where voluntary departure was upheld, there was only one of those reported. And so it's – I think that's part of the reason that we can't find one directly on all fours. But Campos Granillo and Matter of Gamboa are both instances where the immigrants had a number of illegal entries, some of those with smugglers. In Campos Granillo, the immigrant had actually smuggled in his wife and three children. And this court remanded, I think, acknowledging that voluntary departure was plausible. And in Matter of Gamboa, the BIA upheld a grant of voluntary departure under those similar circumstances. So that, I think, is evidence that it would have been plausible that an I.J. would have granted voluntary departure. Something else to keep in mind is that voluntary departure is similar to voluntary return, which Mr. Martinez had been granted ten times in the past. And so it would have been an incremental increase for the I.J. here to grant voluntary departure before imposing a formal order of removal on Mr. Martinez. This would have been sort of the next step in his process, because he'd never before been before an immigration judge. This was his first time. I'd like to just make a few points on the advisal, unless Your Honor has more questions on prejudice. I'm happy to answer those. The advisal, the I.J. didn't convey the benefits and the consequences here. He said, I have the authority to grant you relief, which, if granted, would allow you to stay in the United States legally, but not to exceed 120 days. And then instead of getting deported, you would have to depart the United States by yourself. That's not an accurate description of voluntary departure. It sounds like you can stay here, but at the most four months, and then instead of getting deported, you have to depart the United States by yourself. This is focusing on the physical act of deportation, leaving the United States. But there's also a legal act involved in deportation, and that's the order of removal, the formal order of removal that's entered against you. And if you don't have a formal order of removal entered against you, like when you receive voluntary departure, the process of legally returning in the future is much easier. And the I.J. here didn't convey that to Mr. Martinez. He focused on the physical act of how you leave. You either leave paying for yourself, or we, the United States, can remove you. And to someone in Mr. Martinez's position, he was 20 years old, he was pro se, he had a ninth-grade education. That really doesn't convey the benefit here. So it didn't give him a meaningful advisal and a meaningful opportunity to apply for that relief. Someone in his position would think, why would I apply for this? It doesn't really give me any benefit. It just means that I have to pay my own way out of the country. Okay. Can you explain to me what the difference is? Was this pre-conclusion voluntary departure? Yes, Your Honor. So that means there would be no order of deportation. Correct. So post-conclusion voluntary departure is what we see all the time because we've seen the I.J. opinion deny it. Correct. So this is the kind of thing we don't see. Correct. This comes up less frequently. Okay. It comes up in these 1326d motions, I think, but not in the BIA cases. Okay. Unless Your Honors have any further questions, I'll reserve the remainder of my time for rebuttal. Thank you. Thank you. Thank you. Good morning, Your Honors. May it please the Court. Joseph Orabona on behalf of the United States for this matter. It was implausible that a person with the extensive immigration violations that this defendant had would receive voluntary departure as a matter of discretion without some sort of substantial countervailing positive equities which were just not present in this case. Well, wait a second. The I.J. didn't explore any equities when he was going through this process with ten aliens at the same time. He wasn't even talking about individual equities with them. Your Honor, with regards to Mr. Martinez's individual hearing, he did go through those equities. I would submit that the questioning that the I.J. had with Mr. Martinez explored those positive equities, the ones that are articulated in Rojas-Pedrosa, for example, whether he had close family ties in the United States, whether he had a long history of residence in the United States, or whether there were any of those type of humanitarian needs like whether he had family here such that, you know, would tear the family apart, those kinds of considerations that would be taken into account. He was asked the question about whether or not he had a parent, a spouse, or a child living in the United States. He answered no to those questions. He was also asked when the first time it was that he came to the United States to try to ascertain whether or not he had been living here a long time. And his response was that he came here in 2005. His immigration hearing was in 2006. So at most, he may have been residing in the United States, according to his own admission, within a year period of time. Countervailing that with the other side, he, Ms. Robinson, was asked what the history was, the negative equities. And she did articulate that he was apprehended on this instance. Who is Mrs. Robins, Ms. Robinson? She was the government attorney at the hearing. Right. He didn't have an attorney, right? No, he did not have an attorney. Did he speak English? No, he did not. He had a Spanish interpreter. And he had nine years of education in what country? In Mexico. Is it your position that there was an inadequate advisement or a due process problem, but there's no prejudice? No. I contend that there was no due process violation. But the Court doesn't need to even reach that, because I don't think that there's prejudice, that he has met his burden to show prejudice in the first place. With regard to the due process violation, the reason I contend that there was no due process is that as counsel for the appellant conceded, he was advised, he was informed of what voluntary departure meant. They conceded that in their reply brief at pages 4 through 5. And Mr. Smith, the attorney at the hearing, also conceded it during oral argument that he was technically advised what voluntary departure meant. And so he did receive that advisal, and the immigration judge did what would be akin to an oral application for voluntary departure. He asked all of the key questions that needed to be asked of Mr. Martinez to determine whether or not the positive factors outweighed the negative factors in the situation. Do you know any of the circumstances surrounding his prior removals? Yes, Your Honor. In particular, if you look at, this is S.E.R. 25. This is the. What is it? It's the I-213 for the instant apprehension on April 14, 2006. And I'm reading from the top of this, from this document. It's noted that an alert was placed into IDENT, the immigration system, in October of 2005, saying that Mr. Martinez was believed to be an alien smuggler that smuggles illegal aliens into the United States on foot. If you look at the other 213s that were placed in the record, Mr. Martinez received apprehensions three in August of 2005, four in September of 2005, one in October of 2005. By my calculation, that's eight. So by the time he was apprehended the eighth time, they had entered into IDENT a notification that he had been suspected of smuggling aliens. He was apprehended two more times, once in December of 2005 and once in February of 2006. So just within a six-month period, Mr. Martinez had been apprehended by the immigration service and been given voluntary return. By the time he reached his immigration hearing in April. So, but when he was given voluntary return, you're talking about this isn't even, this doesn't reach the IJ. This is the officers just let him go? Is that what it is? That's correct. They document his apprehension. They fingerprint him as documented in the report. And then they voluntarily return him to Mexico without any order. So this is just, there's no proceedings. It's the border patrol does this. That's correct. There's no proceedings. It's just a voluntary return, which is a benefit to Mr. Martinez. No, no, I understand. But when you say voluntary return, they're deporting him, right? Or are they, I mean, they're not letting him go in the United States, right? That's correct. They're not. Okay. So they're deporting him. Yes, they are. Well, they're not deporting him or removing him in the technical or legal sense. They refer to it as a voluntary return because there is no order of integration. But they don't let him loose. It's not the same voluntary departure. It's not. As the one we're talking about in this case. This is a different thing. Correct. It's completely separate. That's right. Under voluntary departure, he has a certain time period to depart on his own. They actually do release him into the United States. It's appropriate in situations where somebody has a long residency or history in the United States, as you see in some of the cases. They've been here 20 years. They have family. They're there to get their things in order so that they do have the opportunity to depart on their own and then have an opportunity to reapply for admission without having that deportation order in place. And so it is different, a voluntary departure. But they document it. So that's how they know that there were 10 or 11? That's correct. And you can see that in the ident history that the government submitted. It's S.E.R., their exhibits on S.E.R. 5 through, I believe, 19 or 20. So he's fingerprinted. He's apprehended. And there is actually a report that is also generated. And you'll see those reports documented in the S.E.R.s, S.E.R. 27, 28, all the way through 38, 37. So you don't contest that he was statutorily eligible for the voluntary departure? He was statutorily eligible for voluntary departure. No prior criminal convictions? He had no prior criminal convictions, although he did have he was engaged in criminal conduct, which was one of the negative factors that was considered. Well, I know they charged him with that. And I know I read the transcript where Ms. Robinson says that, and he says yes. But, you know, it's not like you can say that he understood he was admitting to criminal conduct. I think at that time, given the amount of apprehensions that he had, it was clear that he was admitting to leading the nine aliens into the United States and rafting them across the canal. In fact, in the report that I just cited to Your Honor, the April 14th report, there were two of the aliens that he smuggled that actually pointed him out as the smuggler in that instance. I'm curious. Where are the elements of alien smuggling? I'm sorry, Your Honor, I don't have those. Okay. I guess I can look it up. In particular, in making the admission itself, I think it aggravates the situation to a degree, because he's not an individual that was just part of the group. He rafted them across a very dangerous canal. I know Your Honors have seen cases where people are smuggled across the All-American Corral Canal. It's very dangerous. People have drowned there before. I actually haven't seen cases of people being rafted over the All-American Canal. United States v. Zavala. Zavala was a very similar situation to this case, where that individual was part of a group that was smuggled across the canal. And in that case, the IJ actually told Mr. Zavala that he shouldn't do that, that it's extremely dangerous, that people have died there, that people have drowned there. So that's an example of a case that this Court has decided. Where is the All-American Canal? It's out in Calexico in East County. And it's right along the border of Calexico and the United States. And what makes it so dangerous? The canal itself has a very treacherous waterway. It's extremely polluted. It has groundwater from Mexico that fills into the canal, groundwater from the United States, wastewater that fills into the canal. Just the terrain within the canal itself makes it very dangerous. At times, they overload the rafts. Like in this case, he rafted them across. They'll put nine people into a small raft. There's no discerning whether or not those aliens could swim or not. When they are placed into those rafts, there are no life preservers, none of the things that you would expect if you were going seaworthy and expected to be safe. And then they take them across that canal. So this is extremely dangerous in that area. I see that I'm almost out of time. I do think that the negative equities here far outweigh the positive equities. Even Mr. Martinez's 18-month residency that he claimed in his declaration, there is no case that is cited that says that that's a lengthy residency in the United States. In fact, the cases that are cited show that the residency is more 5 to 8 to 15 to 21 years in the United States. These are small children who are being brought to the United States who live here a very, very long time. Mr. Martinez didn't have his parents living here. They were citizens and nationals of Mexico. They had not crossed into the United States. And I don't think that a dating relationship alone is really something that should be considered a close family tie that would warrant having those positive equities outweigh the negative. On that, I would submit. Thank you very much. Thank you. Let's make two quick points, Your Honors. The first is Judge Wardlaw's questions about voluntary removal versus voluntary departure and the physical act. Your Honor referred to it as being deported. I think that underscores why this misadvisal was so confusing to someone in Mr. Martinez's because the IJ equated departing the United States and being deported and didn't make it clear to Mr. Martinez that there's a difference in being physically deported and having a legal order of deportation against you, which voluntary departure would have done away with. So that's the exact reason why someone who was 20 years old and pro se and had a ninth grade education would have been confused by this advisal and wouldn't have understood that there was a benefit to it, to voluntary departure, and then would have been encouraged to apply for it. My second point is he left or returned ten times, right? Pardon, Your Honor? He returned ten times? Yes, Your Honor. He did have ten prior illegal entries. Over what period of time? About a year prior to this. But again, the Immigration Service never considered those serious enough to ever put him in any type of formal removal proceeding. They kept sending him back across the border. We call it in our district catch and release. They catch someone there at the border, Border Patrol does it there on the scene, and they send the person back across the border. And so these weren't, I know they sound serious here, it is ten, but they weren't viewed as that serious by the Immigration Service because they just kept sending him back across the border. Now he's set to be released from prison in a couple weeks, right? Yes, Your Honor, next month. And then what's his supervised release? He'll be deported, Your Honor, and so I think supervision will be waived. Let me double check. I apologize, Your Honor. He has three years of supervised release. My last point is just in regards to the immigration judge asking about his equities. This is at ER 178. He was actually asking about adjustment of status or asylum. The questions that he asked didn't go to voluntary departure. He's asking if Mr. Martinez's fear is being tortured or persecuted in Mexico, whether he has a wife, parent, or child with parents or permission, I'm sorry, with papers or permission to be here in the United States. Those are questions about a grant of asylum or adjustment of status. Those aren't questions about work history or any other family members are here or anything else that would have weighed in the equities of granting voluntary departure. Thank you, Your Honors. Thank you, Counsel. The case is argued and will be submitted.
judges: Reinhardt, Wardlaw, Whyte